**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| EDWIN PHELPS, | ) |
| | ) CASE NO.  1:09-CV-1039 |
| Plaintiff, | ) |
| | ) JUDGE BOYKO |
| v. | ) |
| | ) MAGISTRATE JUDGE VECCHIARELLI |
| U.S. METALS GROUP, *et al.*, | ) |
| | ) REPORT & RECOMMENDATION |
| Defendants. | ) Doc. No. 8 |

This case is before the magistrate judge on referral.  Before the court is the

motion of defendants, U.S. Metals Group ("US Metals"), Jim Lagoria, and Sam Abondo,

to stay the proceedings and compel arbitration.  Doc. No. 16.  Plaintiff, Edwin Phelps

("Phelps"), opposes defendants' motion.  Doc. No. 19.  For the reasons given below, the

motion should be granted and the case stayed pending arbitration.

I.  Background

Phelps is a resident of Ohio.  Defendants do not contest Phelps' contention that

they are residents of California.  The amount in controversy exceeds $75,000.  This

court has jurisdiction pursuant to 28 U.S.C. §1332.  Except where otherwise noted, the

parties do not dispute the following facts.

In June 2008, Phelps entered into a contract with US Metals ("the contract")

whereby US Metals agreed to invest in precious metals on Phelps' behalf.[1]  The

---

[1]  Phelps contends that US Metals first contacted him by telephone.  US Metals
replies that it is unclear who first contacted whom.

contract was specifically for the physical ownership of precious metals on the spot

market and warned Phelps of the possibility of trading losses due to price declines.  In

relevant part, the contract also provided the following:

> Arbitration with Governing Law and Venue
>
> The parties agree that any disputes relating to this Account will be submitted to binding arbitration. The venue for any such arbitration shall be exclusive in the State of California and all parties agree that any arbitration award entered shall be binding and convertible to a State of California judgment subject to the laws of the State of California and further subject to any modifications thereof permissible there under. The parties hereby accordingly waive their right to any other remedy or to proceed with any court actions and further hereby waive jurisdiction and venue. US Metals Group (hereafter referred to as "the Company"), it's employees and executives, and all other parties employed by or contracted with the Company, are not to be held legally or otherwise responsible for any financial loss as of the result of the customer's transactions through the customer's broker or any other communication with the Company.
>
> This Account and the activities contemplated hereunder shall be governed by the substantive and procedural laws of Los Angeles County, the State of California without respect to California conflict of law rules and venue of any dispute resolution shall likewise be in Los Angeles County, State of California with respect to California conflict of law rules.

Risk Factors and Disclosure Statement ("Disclosure Statement"), Complaint (Doc. No.

1), unlettered exhibit, p. 2.  Phelps contends that he was fraudulently induced to enter

into this contract.  Phelps asserts that he then deposited $73,000.00 in his account with

US Metals.

According to Phelps, the contract was for the purchase of silver only.  US Metals

contends that the contract was for the purchase of precious metals generally, at Phelps'

direction.[2]

---

[2]  Neither party has submitted to the court any of the contract's provisions beyond those in the "Risk Factors and Disclosure Statement."  Missing portions of the contract include the customer application, the customer account agreement, the appointment of

Defendants have submitted by way of affidavit a purported true and accurate transcription of a telephone conversation between Phelps and a US Metals compliance representative recorded on June 12, 2008.[3]  The transcript reads in its entirety as follows:

| | |
|---|---|
| COMPLIANCE | Hello. Okay.  You're here with U.S. Metals Group.  You are speaking into a recorded line.  Do I have your permission to record this conversation? |
| PHELPS | Yes. |
| COMPLIANCE | Okay.  Can you ple . . . Today's date is **June 11, 2008 . . . .** |
| PHELPS | 12th. |
| COMPLIANCE | 12th, you're right.  Thank you for correcting me.  Can you please state your full name for me? |
| PHELPS | Edwin F. Phelps, Jr. |
| COMPLIANCE | Okay.  And for verification purpose, can you please verify your address on file? |
| PHELPS | [REDACTED] |
| COMPLIANCE | thank you, and your home phone number and cell phone number, starting with your area code that you put on file. |
| PHELPS | [REDACTED] |
| COMPLIANCE | Okay, and you're occupation, how long you've been employed.  Looks like you put in retired.  Is that correct? |
| PHELPS | I am retired. |
| COMPLIANCE | Okay.  And your annual income in, approximate annual |

broker/agent/legal representative, and the customer account terms and conditions.

[3] Recorded Phone Conversations between U.S. Metals Group and Edwin F. Phelps, Jr. ("recorded Conversation"), Reply (Doc. No. 20), Exh. A.

3

|  | income that you have on file. |
|---|---|
| PHELPS | $100,000. |
| COMPLIANCE | Okay.  What I'm going to go ahead and do is go over our risk disclosures with you real quick. |
| PHELPS | uh huh. |
| COMPLIANCE | Okay.  The precious market . . . the precious metals market just like any other market can move both up and down; therefore, it's possible to make money and lose money trading on this market.  Do you understand this? |
| PHELPS | I do. |
| COMPLIANCE | Good.  There is no guarantee in any market and only risk capital should be used when trading with us.  I want to verify that you are using risk capital. |
| PHELPS | Yes. |
| COMPLIANCE | Okay.  To get your account started you are depositing $35,000.  There is a 15% administrative fee and a one time new account fee that is of total metal value.  You understand that you may trade this metal commission-free as often as you like for the life of the account. |
| PHELPS | Yes. |
| COMPLIANCE | You would, however, pay additional fees on any new order of if you have moved into another metal.  You understand that. |
| PHELPS | Yes. |
| COMPLIANCE | Okay.  I want to go ahead and also . . . You do understand that the clearing house providing the financing for the unpaid balance of the metal required . . . acquired in this transaction. |
| PHELPS | Yes. |
| COMPLIANCE | The interest is 4-½ above prime for year and deducted from your equity on a day-to-day basis from the duration of the |

4

|            |                                                                                                                                                                                 |
|------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            | transaction.  Do you understand this?                                                                                                                                            |
| PHELPS     | Yes.                                                                                                                                                                            |
| COMPLIANCE | Okay.  If, for any reason, your brok . . . You're not able to get a hold of your broker, please ask for me or anybody in compliance and we're more than glad to help you out with your account.  Okay? |
| PHELPS     | Yes.                                                                                                                                                                            |
| COMPLIANCE | Okay, I want to go ahead and warmly welcome you to U.S. Metals and wish you the best of luck.  Okay.                                                                            |
| PHELPS     | Yes.                                                                                                                                                                            |
| COMPLIANCE | Hold on a moment and I'll put you back to your broker.  Hold on.                                                                                                               |

Recorded Conversation at 1-2 (emphasis in the original).

Phelps alleges that US Metals sent him a "clearing house agreement" which would have allowed US Metals to trade metals on margin on Phelps' behalf.  According to Phelps, he was uncomfortable with this arrangement and refused to sign the agreement.  Shortly thereafter, Phelps asserts, an otherwise unidentified person who referred to himself as "the Russian" called Phelps on behalf of US Metals to urge Phelps to invest in palladium.  According to Phelps, he refused to agree to this then or at any time thereafter.

Defendants have submitted by way of affidavit a purported true and accurate transcription of a telephone conversation between Phelps and a US Metals compliance representative recorded on June 17, 2008.  The transcript reads in its entirety as follows:

|            |            |
|------------|------------|
| COMPLIANCE | Hey Edwin. |

5

PHELPS          Yes.

COMPLIANCE      You're speaking into a recorded line.  Do I have your permission to record this conversation?

PHELPS          Yes.

COMPLIANCE      Today's date is **June 17, 2008**.  It's approximately 8:30 A.M. Pacific Standard Time.  Can you please state your full name for me?

PHELPS          Edwin F. Phelps, Jr.

COMPLIANCE      Okay.  Edwin, your account number . . . You want to write this down . . . is [REDACTED].

PHELPS          Wait a minute.  Start over again.  [REDACTED].

COMPLIANCE      You got it.  That's it.

PHELPS          Okay.  Okay.

COMPLIANCE      Okay, and I have an order for your account as follows, that is to buy 5,100 ounces of silver.  Is this correct?

PHELPS          5,100 ounces.  Yep.

COMPLIANCE      You do authorize this trade.

PHELPS          I do.

COMPLIANCE      We'll place a trade as soon as we get a fill.  I'll have your broker give you a call.  Okay?

PHELPS          Okay.

COMPLIANCE      Okay.  Have a good day.

PHELPS          Thanks.

COMPLIANCE      Bye.  Bye.

Recorded Conversation at 2-3 (emphasis in the original).

Beginning about June 30, 2008, Phelps alleges that he made many attempts to

6

contact US Metals by telephone, fax, and posted letter to ask about his account and to obtain more information about the possibility of investing in palladium.  Phelps states that US Metals refused to respond to these inquiries.  Phelps also asserts that US Metals never sent him a confirmation of the purchase of silver on Phelps' behalf.  The lack of confirmation, *inter alia*, leads Phelps to conclude that the purchase never took place.

Defendants have submitted by way of affidavit a purported true and accurate transcription of a telephone conversation between Phelps and a US Metals compliance representative recorded on July 11, 2008.  The transcript reads in its entirety as follows:

| | |
|---|---|
| COMPLIANCE | Ed? |
| PHELPS | Yep. |
| COMPLIANCE | You're speaking into a recorded line.  Do I have your permission to record this conversation? |
| PHELPS | Yes, you do. |
| COMPLIANCE | Today's date is **July 11, 2008**.  The time is 10:48 A.M. Pacific Standard Time.  Would you please state your full name for me? |
| PHELPS | Edwin F. Phelps. |
| COMPLIANCE | Okay.  I have an order for your account.  Your account number is [REDACTED].  You have deposited $38,000.  This is for the acquisition of 200 ounces of palladium.  Is this correct? |
| PHELPS | Correct. |
| COMPLIANCE | And you authorize this? |
| PHELPS | Right. |
| COMPLIANCE | Okay. |

7

Recorded Conversation at 3 (emphasis in the original).

In late July or early August 2008, Phelps contends that a person claiming to be a representative of US Metals telephoned him to tell him that the value of silver and palladium was falling and that Phelps had to make a decision quickly whether to invest in more silver or to invest in palladium.

On July 23, 2008, Phelps received a statement of account showing that his account currently held 5,100 ounces of silver and 200 ounces of palladium.  Phelps contends that as the total value of the account at the then-current values of silver and palladium was nearly $200,000, he concluded that US Metals was trading in silver on margin and in palladium on his behalf.  Phelps avers that both types of trades were against his wishes and without his consent.

In August 2008, Phelps asserts that a representative of US Metals told him that the value of his account had dropped from $73,000 to $3,000.  According to Phelps, the representative urged him either to sell the metal he still held or buy more in an attempt to cover his losses.

Phelps filed this action on May 6, 2009.  Phelps asserts the following causes of action in his complaint:  breach of oral contract; breach of contract; fraudulent inducement; common law fraud; sale of unregistered securities in violation of the Securities Act of 1933, as amended; securities fraud in violation of § 12(2) of the Securities Act; securities fraud in violation of § 10b-5 of the Securities and Exchange Act of 1934; negligent misrepresentation; conversion; unjust enrichment; sale of unregistered securities in violation of Ohio Rev. Code § 1707; securities fraud in violation of Ohio Rev. Code § 1707.41; civil conspiracy; declaratory judgment; violation

8

of the Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.01-1345.28; and

violation of the Ohio Home Solicitation Sales Act, Ohio Rev. Code §§ 1345.21-1345.28.

Defendants now move to stay the proceedings and compel arbitration.

II.  The Standard for Adjudicating a Motion to Compel Arbitration

Congress passed the Federal Arbitration Act ("FAA") in 1925 to enact "'a national

policy favoring arbitration' of claims that parties contract to settle in that manner . . . ."

*Vaden v. Discover Bank,* _____ U.S. _____, 129 S.Ct. 1262, 1271 (2009) (quoting *Preston v.*

*Ferrer,* 552 U.S.___, ___, 128 S.Ct. 978, 983 (2008)).  The FAA manifests "a liberal

federal policy favoring arbitration agreements."  *Moses H. Cone Mem'l Hosp. v. Mercury*

*Constr. Corp.,* 460 U.S. 1, 24 (1983); *Masco Corp. v. Zurich American Ins. Co.,* 382

F.3d 624 (6th Cir. 2004).

Section 2 of the FAA provides in relevant part:

> A written provision in any . . . contract evidencing a transaction involving
> commerce to settle by arbitration a controversy thereafter arising out of such
> contract or transaction, or the refusal to perform the whole or any part thereof . . .
> shall be valid, irrevocable, and enforceable, save upon such grounds as exist at
> law or in equity for the revocation of any contract.

9 U.S.C. § 2.  A party may petition in "any United States district court which, save for

such agreement, would have jurisdiction under title 28 . . . of the subject matter of a suit

arising out of the controversy between the parties" to compel arbitration pursuant to an

arbitration clause.  9 U.S.C. § 4.  The district court should dispose of a suit involving an

arbitration clause as follows:

> [U]pon being satisfied that the issue involved in such suit or proceeding is
> referable to arbitration under such an agreement, shall on application of one of
> the parties stay the trial of the action until such arbitration has been had in
> accordance with the terms of the agreement, providing the applicant for the stay
> is not in default in proceeding with such arbitration.

9

9 U.S.C. § 3.  In any dispute involving an arbitration clause, the party seeking to avoid arbitration has the burden of proof.  *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26 (1991).

In proceeding with a motion to compel arbitration, a court must first determine if the parties intended to arbitrate their dispute.  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626 (1985).  In making this determination,

> where the agreement contains an arbitration clause, the court should apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *See AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 648-51, 106 S.Ct. 1415, 1418-19, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation, Co.,* 363 U.S. at 582-83, 80 S.Ct. at 1353 (1960)).  Moreover, in cases involving broad arbitration clauses the [U.S. Supreme] Court has found the presumption of arbitrability "particularly applicable," and only an express provision excluding a particular grievance from arbitration or "the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."  *Id.,* 475 U.S. at 650, 106 S.Ct. at 1419 (quoting *Warrior & Gulf Navigation,* 363 U.S. at 584-85, 80 S.Ct. 1347); *see also International Union, UAW v. United Screw & Bolt Corp.,* 941 F.2d 466, 472-73 (6th Cir.1991) (finding that the employer had "not satisfied the requirement for forceful evidence to overcome the presumption that the grievances should be arbitrated").

*Simon v. Pfizer Inc.,* 398 F.3d 765, 773 n.12 (6th Cir. 2005) (quoting *United Steelworkers v. Mead Corp.,* 21 F.3d 128, 131 (6th Cir.1994)).

Despite the strong policy in favor of arbitration, parties may not be compelled to arbitrate without their consent:

> [T]he federal policy in favor of arbitration is not an absolute one.  Arbitration under the Federal Arbitration Act is "a matter of consent, not coercion."  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).  "While ambiguities in the language of the agreement should be resolved in favor of arbitration, we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated."  *E.E.O.C.*

> *v. Waffle House, Inc.,* 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) (internal citation omitted).  This Court has recently stated that "no matter how strong the federal policy favors arbitration, arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration."  *Simon v. Pfizer Inc.,* 398 F.3d 765, 775 (6th Cir.2005) (internal citations omitted).

*Albert M. Higley Co. v. N/S Corp.,* 445 F.3d 861, 863 (6th Cir. 2006).

> A party may put the validity of the agreement to arbitrate at issue:
> In order to show that the validity of the agreement is "in issue," the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate.  *See Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 129-30 (2d Cir.), *cert. denied,*522 U.S. 948, 118 S.Ct. 365, 139 L.Ed.2d 284 (1997).  The required showing mirrors that required to withstand summary judgment in a civil suit.  *Id.*  In reviewing the district court opinion, therefore, we view all facts and inferences drawn therefrom in the light most favorable to [arbitration] resisting the Simonses, and determine whether the evidence presented is such that a reasonable finder of fact could conclude that no valid agreement to arbitrate exists.  *See Aiken v. City of Memphis,* 190 F.3d 753, 755 (6th Cir.1999) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), *cert. denied,*528 U.S. 1157, 120 S.Ct. 1164, 145 L.Ed.2d 1075 (2000).

*Great Earth Companies, Inc. v. Simons,* 288 F.3d 878, 889 (6th Cir. 2002).

The Sixth Circuit is clear about the permitted scope of the challenge to the

agreement's validity and the law to be applied in resolving whether the arbitration clause

is valid:

> In determining whether the parties have made a valid arbitration agreement, "state law may be applied *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally," although the FAA preempts "state laws applicable *only* to arbitration provisions."  [*Doctor's Assocs., Inc. v.*] *Casarotto,* [517 U.S. 681, 686-87 (1996)] (quotation omitted).  Therefore, state law governs "generally applicable contract defenses [to an arbitration clause], such as fraud, duress, or unconscionability."  *Id.* at 687, 116 S.Ct. 1652. In assessing whether an agreement to arbitrate has been made, moreover, "[c]ourts are to examine the language of the contract in light of the strong federal policy in favor of arbitration.  Likewise, any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration." *J.D. Byrider,* 228 F.3d at 714.

11

The Supreme Court has explained that in deciding whether a valid agreement to arbitrate exists, district courts may consider only claims concerning the validity of the arbitration clause itself, as opposed to challenges to the validity of the contract as a whole:

> if the claim is fraud in the inducement of the arbitration clause itself--an issue which goes to the 'making' of the agreement to arbitrate--the federal court may proceed to adjudicate it.  But the statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).  Once the district court determines that a valid agreement to arbitrate exists, challenges to other distinct parts of the contract are to be resolved by the arbitrator.  *Id.*  In order to place the validity of the agreement to arbitrate in issue, therefore, the party opposing the petition to compel arbitration must state a "well-founded claim of fraud in the inducement of the arbitration clause itself, *standing apart from the whole agreement,* that would provide grounds for the revocation of the agreement to arbitrate."  *Arnold,* 920 F.2d at 1278.

*Great Earth,* 288 F.3d at 889-90.

### III.  Choice of Law

Phelps relies largely on Ohio law[4] in arguing his claims and offers no arguments in support of this choice.  The contract provides, "This Account and the activities contemplated hereunder shall be governed by the substantive and procedural laws of Los Angeles County, the State of California . . . ."  Disclosure Statement at 3.  Defendants assert that California law applies to Phelps' claims.  The court shall examine, therefore, which law should be applied to the analysis of Phelps' claims.

A federal court sitting in diversity applies the choice of law rules of the state in which it sits.  *Day & Zimmerman, Inc. v. Challoner,* 423 U.S. 3 (1975); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487 (1941); *Security Ins. Co. of Hartford v. Kevin*

---

[4]  He also occasionally uses California law.

12

*Tucker & Assoc., Inc.*, 64 F.3d 1001, 1005 (6th Cir. 1995).  When the case sounds in contract, Ohio's choice of law rules require a court to apply the law of the state with the most significant relationship to the contract unless the parties have specified which state's substantive law should govern the contract.  *National Union Fire Ins. Co. v. Watts*, 963 F.2d 148, 150 (6th Cir. 1992).

When the parties have designated the law of a forum other than Ohio, Ohio applies the rule set forth in the Restatement of Law 2d (1971) 561, Conflict of Laws, Section 187, which provides in relevant part:

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.*,  6 Ohio St. 3d 436, 438-39, 453 N.E.2d 683, 686 (1983).

Ohio has not addressed the issue of whether a choice of law provision should be observed when a party alleges that the contract is one of adhesion.  *See Sekeres v. Arbaugh*, 31 Ohio St. 3d 24, 33, 508 N.E.2d 941, 948 (1987) (Brown, J., dissenting).  However, under Ohio law, even if a contract is an adhesion contract and "the party accepting the form is weaker and has no realistic choice as to the terms . . . ,  the contract is not per se unconscionable."  *Bohl v. Hauke*, 180 Ohio App. 3d 526, 906 N.E.2d 450, 452-53 (2009) (citing *Taylor Bldg. Corp. of Am. v. Benfield,* 117 Ohio St. 3d

13

352, 884 N.E.2d 12 (2008)).  In determining whether a choice of law should be respected under these circumstances, Ohio courts have nevertheless used the test in *Schulke* under these circumstances.  *See* *Sekeres*, 31 Ohio St. 3d at 22-26, 508 N.E.2d at 942-43 and *Sekeres*, 31 Ohio St. 3d at 33, 508 N.E.2d at 948 (Brown, J., dissenting). That is the test, therefore, that this court shall apply.

Under the *Schulke* test, California law should govern Phelps' account and the activities contemplated under that account unless California "has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or unless "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue . . . ."  It cannot be said that California lacks a substantial relationship to the transaction or the parties, as the defendants reside in California, the written and oral contracts were made both in California and Ohio, and US Metals executed the required purchases from California. *See* *Industrial Indem. Co. v. Cordray*, 1994 WL 532055, at *2 (Ohio App. Sept. 30, 1994).  Nor can it be said on the facts before the court that Ohio has a materially greater interest than California in the account or the activities under the account.  As the exceptions under the *Schulke* test do not apply, California law should be applied in adjudicating any disputes relating to Phelps' account.

IV.  Application to Phelps' Case

The contract states, "The parties agree that any disputes relating to this Account will be submitted to binding arbitration."  Phelps does not deny that the contract contains a provision requiring arbitration.  Moreover, although Phelps alleges fraud in the

14

inducement of the contract, he does not allege fraud in the making of the agreement to arbitrate.  Rather, Phelps asserts five arguments in support of voiding or refusing to enforce the arbitration clause:  (1) the clause is unenforceable because it is a clause of adhesion; (2) the operation of the arbitration clause makes enforcement unconscionable;[5] (3) the clause is unenforceable because US Metals failed to fulfill its fiduciary duties; (4) Phelps has claims sounding in tort, securities fraud, and other statutory securities actions that are not subject to the arbitration clause; and (5) US Metals' failure to register in the state of Ohio as a precious metals dealer makes the contract void *ab initio*.  Defendants deny that any of these arguments is meritorious.  The court shall examine each of these arguments.

A.      *Whether the arbitration clause is unconscionable*

Both parties treat the determination of whether the contract is an adhesion contract as the central issue in arguing whether the contract is enforceable.  But that is not the central issue under California law.  Rather, the central issue is whether the contract is unconscionable, with the question of whether the contract is an adhesion contract subsidiary to that central issue.  *Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571, 582, 61 Cal. Rptr. 3d 344, 352-53 (2007).  For these reasons, the court shall consider the issues of unconscionability and adhesion together.  As California law requires consideration of fiduciary duty in the context of unconscionability, that issue will also be discussed in this section.

---

[5]  Phelps discusses the operation of the arbitration clause as unconscionable in terms of the demands that travel would place on his time, health, and finances.

15

1.      *The applicable legal framework*

California statutory law permits a court to refuse to enforce an unconscionable

provision in a contract:

> "If the court as a matter of law finds the contract or any clause of the contract to
> have been unconscionable at the time it was made the court may refuse to
> enforce the contract, or it may enforce the remainder of the contract without the
> unconscionable clause, or it may so limit the application of any unconscionable
> clause as to avoid any unconscionable result."  Because unconscionability is a
> reason for refusing to enforce contracts generally, it is also a valid reason for
> refusing to enforce an arbitration agreement . . . .

*Armendariz v. Foundation Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114, 6 P.3d

669, 767 (2000) (quoting Cal. Civ. Code § 1670.5(a)).  Under California law,

unconscionability is a question of law for the court.  Cal. Civ. Code § 1670.5; *Bruni v.

Didion*, 160 Cal. App. 4th 1272, 1290, 73 Cal. Rptr. 3d 395, 410 (2008); *Gutierrez v.

Autowest, Inc.*, 114 Cal. App. 4th 77, 89, 7 Cal. Rptr. 3d 267 (2003).

Contractual unconscionability has procedural and substantive elements, both of

which must be present for a contract to be unconscionable.  A contract provision is

procedurally unconscionable if it procedurally oppresses or surprises the weaker party:

> "Oppression" arises from an inequality of bargaining power which results in no
> real negotiation and "an absence of meaningful choice."  "Surprise" involves the
> extent to which the supposedly agreed-upon terms of the bargain are hidden in a
> prolix printed form drafted by the party seeking to enforce the disputed terms.

*Aron v. U-Haul Co. of California*, 143 Cal. App. 4th 796, 808, 49 Cal. Rptr. 3d 555, 564,

(2007) (citations omitted).  "Oppression" in the formation of a contract differs from the

substantive oppressiveness of the challenged provision.  Procedural oppression refers

to the procedural unconscionability of giving the weaker party no meaningful choice in

deciding whether to agree to the contract.  *See Gatton v. T-Mobile USA, Inc.*, 152 Cal.

16

App. 4th 571, 581 n.5, 61 Cal. Rptr. 3d 344, 352 n.5 (2007).

When substantially similar goods or services are not available elsewhere and there are indications that the arbitration clause may not be negotiated away, California courts will find "an absence of meaningful choice" and procedural oppression.  *See, e.g.*, *Bruni v. Didion*, 160 Cal. App. 4th 1272, 73 Cal. Rptr. 3d 395 (2008) (finding oppression where any attempt to negotiate the purchase price would have been fruitless due to a three-way relationship between the builder, a home warranty corporation, and the buyer); *Pardee Construction Co. v. Superior Court,* 100 Cal. App. 4th 1081, 123 Cal. Rptr. 2d 288 (2002) (finding that a homebuilder's standard purchase agreement including arbitration was procedurally oppressive where the court held that the houses were not fungible commodities and the builder presented a "take-it-or-leave-it" proposition with regard to the contract).  The availability of alternative goods or services and the presence of a sophisticated weaker party will decrease the degree of procedural unconscionability but will not eliminate it.  *Gatton,*  152 Cal. App. 4th at 583-85, 61 Cal. Rptr. 3d at 354-55; *but see Trend Homes, Inc. v. Superior Court*, 131 Cal. App. 4th 950, 32 Cal. Rptr. 3d 411 (2005) (finding that a homebuilder's purchase contract was not procedurally oppressive in the absence of evidence (1) that the builder would have refused to delete the provision and (2) concerning the availability of similarly priced housing in the area).

California courts will find "surprise" when the terms of the challenged provision are hidden or obscured.  *See Roman v. Superior Court*, 172 Cal. App. 4th 1462, 92 Cal. Rptr. 3d 153 (2009) (finding no procedural unfairness where the arbitration agreement was on the last of seven pages of an employment contract, underneath the heading

17

"Please Read Carefully, Initial Each Paragraph and Sign Below," and was in a succinct four-sentence paragraph); *Bruni*, 160 Cal. App. 4th 1272, 73 Cal. Rptr. 3d 395 (finding surprise where the arbitration information was buried in what was described as a "warranty" and did not require a separate signature); *Higgins v. Superior Court*, 140 Cal. App. 4th 1238, 1252-1253, 45 Cal. Rptr. 3d 293 (2006) (finding procedural unconscionability where the arbitration clause was buried in a document of 24 single-spaced pages plus attachments; there was nothing to draw attention to the clause; and plaintiffs were young, unsophisticated, and emotionally vulnerable); *Trend-Homes* (finding that there was no surprise where the arbitration provision was clearly written, capitalized, and easily understood; both parties had to initial the provision; there was no evidence that plaintiffs' lacked the sophistication to understand the contracts or had insufficient time to read it carefully); *Woodside Homes of Cal., Inc. v. Superior Court*, 107 Cal. App. 4th 723, 132 Cal. Rptr. 2d 35 (2003) (finding no surprise where the arbitration paragraph had to be initialed separately).

Adhesion is related to procedural unconscionability.  If a contract is an adhesion contract, it is procedurally unconscionable.  *Gatton*, 152 Cal. App. 4th at 582, 61 Cal. Rptr. 3d at 352-53.  Under California law, a contract is an adhesion contract if it is "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it."  *Armendariz*, 24 Cal. 4th at 113, 6 P.3d at 767. If a party is presented with a standardized contract without "reasonable notice of [the] opportunity to negotiate or reject the terms of a contract, *and* . . . an actual, meaningful, and reasonable choice to exercise that discretion," that contract is an adhesion contract.

18

*Parada v. Superior Court*, 176 Cal. App. 4th 1554, 98 Cal. Rptr. 3d 743, 757 (2009) (quoting *Circuit City Stores, Inc. v. Mantor*, 335 F.3d 1101, 1106 (9th Cir. 2003)).

Substantive unconscionability refers to the fairness of the contract's terms.  A contract provision is substantively unconscionable if it has overly-harsh or one-sided results.   *Armendariz*, 24 Cal. 4th at 114, 6 P.3d at 767.  "Overly harsh" or "one-sided" are not synonymous with "unreasonable."  "With a concept as nebulous as 'unconscionability' it is important that courts not be thrust in the paternalistic role of intervening to change contractual terms that the parties have agreed to merely because the court believes the terms are unreasonable. The terms must shock the conscience." *See* *Gutierrez v. Autowest, Inc.*, 114 Cal. App. 4th 77, 7 Cal. Rptr. 3d 267 (2004) (finding that the requirement that lessees were to post fees that they could not afford without a procedure for a fee waiver rendered arbitration clause substantively unconscionable); *see also* *Higgins*, 140 Cal. App. 4th 1238, 45 Cal. Rptr. 3d 293 (finding substantive unconscionability where the contract bound plaintiffs to arbitrate and not defendants); *Woodside Homes*, 107 Cal. App. 4th 723, 132 Cal. Rptr. 2d 35 (finding that a homebuilder's purchase agreement was not substantively oppressive where "entry level" homes were similarly-priced throughout the region).

Both procedural and substantive unconscionability must be present for a contract provision to be unconscionable:

> But they need not be present in the same degree.  "Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves."  (15 Williston on Contracts (3d ed. 1972) § 1763A, pp. 226-227; see also *A & M Produce Co.*, *supra*, 135 Cal. App.3d at p. 487, 186 Cal. Rptr. 114.)  In other words, the more substantively oppressive the contract term, the less evidence of procedural

unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.

*Id.*, 24 Cal. 4th at 114, 6 P.3d at 767-68.

2.      *Application of the law to this case*

Phelps argues that the arbitration clause is a clause of adhesion and unconscionable, and is, therefore, unenforceable.  He bases his arguments on his contentions that (1) Phelps did not agree to arbitrate in California; (2) he had no opportunity to negotiate away the arbitration clause; (3) defendants had a fiduciary duty to inform Phelps of the arbitration clause and explain it and failed to do so; (4) enforcement of the arbitration clause would require Phelps to make many trips to California; (5) the arbitration clause fails to specify the forum, rules, or fees; (6) there is no allocation of costs; and (7) the costs of arbitration would be prohibitively expensive for Phelps.  Defendants deny that the contract is an adhesion contract or that it is unconscionable.[6]  Given the structure of California law described above, the court shall consider the parties' arguments in the course of determining to what extent, if any, the contract is procedurally and substantively unconscionable.

Under California law, the contract is procedurally unconscionable.  The contract is an adhesion contract because of the difference in bargaining power between Phelps and US Metals, because the contract was a form contract prepared by US Metals, and because the contract gives no notice of the opportunity to accept or reject any term in

_____

    [6] Defendants also argue that under California law only consumer contracts may be adhesion contracts.  Defendants err.  Contracts for the purchase of metals as investments may be adhesion contracts under California law.  *See Parada*, 176 Cal. App. 4th 1554, 98 Cal. Rptr. 3d 743.

the contract.  Because the contract was an adhesion contract, California law would recognize some degree of procedural unconscionability in its formation.

Nevertheless, although the contract was procedurally unconscionable, the level of procedural unconscionability is *de minimis*.  Phelps retired as an executive from General Electric.  According to the "customer profile" he completed when he established his account with US Metals, he had 10 years of investment experience each in bonds, stocks, mutual funds, and private equity instruments and two years of investment experience in commodities.  He was, therefore, a relatively sophisticated party in matters of contract law and investment.  Defendants' Reply, Doc. No. 20, Exh. A. Although there is no indication in the record that US Metals invited negotiation of its arbitration clause, neither is there any indication that US Metals would have refused a request to negotiate the clause.  Additionally, there is no indication that US Metals is the sole source of investments in metals.  Indeed, US Metals tells its customers, "We understand that you have a choice when trading in precious metals and we value your business."  Complaint, Exh. E, p. 2.  The arbitration clause is not hidden:  It is part of a two-page list of 11 paragraphs headed "Risk Factors and Disclosure Statement," a list which the customer must sign on each page.  The customer must also sign a third, additional page acknowledging that he has read, understands, and agrees to the preceding 11 paragraphs.  In sum, although the contract had some degree of procedurally unconscionability because it was an adhesion contract, the level of procedural unconscionability was very low.

Phelps' argument that the contract was procedurally unconscionable because US Metals failed in its fiduciary duty to explain the arbitration clause to him is without merit.

21

Phelps asserts the following two propositions:  1)  A clause granting a broker broad discretion over an investor's holdings creates a fiduciary duty obligating the broker to advise the investor of an arbitration clause; and 2) failure of the broker to advise the investor of an arbitration clause makes the clause unenforceable.  He cites two cases in support of those propositions:  *Willems v. U.S. Bancorp Piper Jaffray, Inc.*, 326 Mont. 103, 107 P.3d 465 (2005), and *Kloss v. Edward D. Jones & Co.*, 310 Mont. 123, 54 P.3d 1 (2002).

There are three problems with Phelps' argument.  First, Montana law has no relevance to the instant case.  Second, even if Montana law were relevant to the case, Phelps presents no evidence to demonstrate that he gave US Metals broad discretion over his holdings.  Third, California law holds that a broker has no fiduciary duty to explain an arbitration clause to a client at the time the client signs the brokerage contract.  *Negrete v. Fidelity & Gaur. Life Ins. Co.*,  444 F. Supp. 2d 998, 1003 (C.D. Calif. 2006); *Rosenthal v. Great Western Fin. Securities Corp.*, 14 Cal. 4th 394, 425-26, 58 Cal. Rptr. 2d 875, 926 P.2d 1061 (1996).  For these reasons, Phelps' argument that the arbitration clause should not be enforced as procedurally unconscionable because US Metals failed in its fiduciary duty to explain the clause is not well-taken.

In addition to arguing that the contract is procedurally unconscionable, Phelps also argues that the arbitration clause is substantively unconscionable.  According to Phelps, the clause is substantively unconscionable because (1) the forum, fees, and allocation of costs are unspecified in the agreement; (2) the arbitration clause would require Phelps, an elderly retired person on a fixed income, to travel many times to California; (3) the arbitration clause absolves US Metals, its associates, and employees

22

from liability relating to his transactions or communications with US Metals; and (4) the language of the arbitration clause regarding which law is applicable to an arbitration and which law is applicable to the contract is confusing.  Defendants deny that the arbitration clause is substantively unconscionable.

That the forum, fees, and allocation of arbitration costs are not specified in the arbitration clause is not substantively unconscionable.  In *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000), the Supreme Court ruled on precisely this point when faced with an arbitration clause in which fees and costs were unspecified.  The Court found that the mere suspicion that fees and costs would be prohibitively expensive is insufficient to invalidate a bargaining agreement.  As in *Green Tree*, Phelps has done nothing more than raise the suspicion that fees and costs will be unconscionable.  As the party seeking to avoid arbitration, Phelps has the burden of proving that fees and costs would be prohibitive.  *Green Tree*, 531 U.S. at 92 ("[W]here . . . a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."); *Gilmer,* 500 U.S. at 26.  Phelps fails to offer such proof.

Phelps also contends that requiring him to arbitrate in California is substantively unconscionable because he would have to travel there "on numerous occasions," Opposition at 8, and because he is an elderly man on a fixed income.  First, there is no evidence that Phelps would have to travel to California "on numerous occasions." Second, although Phelps is elderly, there is no indication in the record that he is in ill health or otherwise frail.  Third, although Phelps is on a fixed income, the customer profile he completed in establishing his account with US Metals indicates that his

23

income is $100,000.00 per year and that his liquid net worth is $1,000,000.00, with a

total net worth of $4,000,000.00.  Defendants' Reply, Doc. No. 20, Exh. A.  The

evidence does not support the conclusion, therefore, that travel to California would

significantly burden Phelps.  Moreover, as the records regarding Phelps' trades are in

California and the witnesses to the execution of those trades are in California,

arbitration in California is at least facially reasonable.  Finally, as defendants note,

Phelps has not explored the possibility of telephone conferences or hearings to avoid at

least some travel costs.  Thus, the arbitration clause is not substantively

unconscionable merely because it would require Phelps to travel to California.

Phelps also argues that the arbitration clause is substantively unconscionable

because it absolves US Metals, its associates, and employees from liability relating to

his transactions or communications with US Metals.  Defendants respond as follows:

> The waiver at issue states that U.S. Metals, "its employees and executives, and
> all other parties employed by or contract with the Company" are not held "legally
> or otherwise responsible for any financial loss as a result of the customer's
> transactions through the customer's broker or any other communication with the
> Company."  (Plaintiff's Brief in Opposition, at p.11 (quoting the arbitration clause
> in the Risk Factors and Disclosure Statement) (emphasis added)).  As evidenced
> by the Risk Factors and Disclosure Statement, Defendants did not have
> discretionary control over Plaintiff's account.  (Exhibit A to U.S. Metals' Motion to
> Compel Arbitration and Stay Proceedings, "Brokers" Section).  Indeed,
> Defendants were merely a conduit through which Plaintiff placed his orders.
> (Id.).  The metal commodities market is replete with inherent risks; a customer
> stands to gain or lose substantial amounts of money.  U.S. Metals, its
> employees, and agents cannot foresee the direction the metal commodities
> market will take.  For this reason, U.S. Metals asks its customers to waive liability
> claims related to the natural occurring forces of the market.  *However, a
> customer's other claims (i.e., fraud) are not waived*.

(Emphasis added.)  Although defendants' interpretation of the language of the waiver is

not the only possible interpretation, it is not an unreasonable interpretation.  California

24

Civ. Code § 1670.5(a) allows a court to "so limit the application of any unconscionable clause as to avoid any unconscionable result."  Requiring Phelps to forego potentially meritorious claims for liability arising from causes other than natural market forces, such as fraud, would be unconscionable.  Consequently, arbitration should be compelled with the proviso that the waiver in the arbitration clause be understood as waiving only those claims related to the natural occurring forces of the market which is the interpretation defendants ascribe to the provision.  With that limitation, the waiver in the arbitration clause is not substantively unconscionable in any respect.

Finally, Phelps contends that the language of the arbitration clause regarding the applicable law is confusing.  The language at issue is as follows:

> This account and the activities contemplated hereunder shall be governed by the substantive and procedural laws of Los Angeles County, the State of California without respect to California conflict of law rules and venue of any dispute resolution shall likewise be in Los Angeles County, State of California without respect to California conflict of law rules.

Complaint, Exh. E, p. 4.  While the two independent clauses in this sentence would benefit from a comma preceding the conjunctive "and" or from disjuncture, there is nothing unduly confusing about the sentence.  The first clause asserts that all matters related to Phelps' account with US Metals are to be governed substantively and procedurally by the law applicable in Los Angeles County, California.  The clause excepts California's conflict of laws rules because the clause itself resolves any potential conflicts of laws.  The second clause requires that dispute resolution take place in Los Angeles County California, again excepting whatever California's conflict of laws rules might say to the contrary.  The sentence is at least reasonably clear.  Phelps' contention to the contrary is not well-taken.

25

At most, the arbitration clause is mildly unconscionable in its substance.  Given the *de minimis* level of procedural unconscionability, the contract's low level of substantive unconscionability falls far short of what is required to render the arbitration clause as a whole unconscionable and unenforceable.  Consequently, the court rejects Phelps' argument that the arbitration clause unenforceable because it is unconscionable.

B.      *Whether Phelps has claims sounding in tort, securities fraud, and other securities statutes that should not be referred for arbitration*

Phelps makes the following argument in his brief in opposition to defendants' motion to compel arbitration:

> A proper method of analysis is to ask if an action could be maintained without reference to the contract or relationship at issue.  If it could, it is likely outside the scope of the arbitration agreement.  Torts may often fall into this category, but merely casting a complaint in tort does not mean that the arbitration provision does not apply.  Even real torts can be covered by arbitration clauses if the allegations underlying the claims touch matters covered by the agreement.  Fazio [*v. Lehman Bros., Inc.*, 340 F.3d 386] at 395 [(6th Cir. 2003)].  Those claims considered to be arbitrable in the case at bar, would be limited to those claims involving the expenditure of his monies for the purchase of silver.  The other claims involve claims of fraud, not part of the buyer's agreement.  Plaintiff did not contract for margin purchases and did not acquiesce to the amounts beyond his original funds.  These are separate tort claims, beyond the applicability of the Arbitration Clause and should be resolved by a court of law instead.

Opposition at 14.  US Metals replies that Phelps did, indeed, contract for margin purchases and did agree to the specific purchases at issue.  Moreover, US Metals replies that because the arbitration agreement specifically holds that "any disputes relating to this Account will be submitted to binding arbitration," all of Phelps' claims are arbitrable.

As the court has already noted, "Once the district court determines that a valid

26

agreement to arbitrate exists, challenges to other distinct parts of the contract are to be

resolved by the arbitrator."  *Great Earth*, 288 F.3d at 889.  The court has already

determined that an arbitration clause exists and that it is enforceable.  Thus, the parties'

dispute as to whether Phelps contracted for margin purchases and agreed to specific

margin purchases is an matter for the arbitrator.

> Moreover,
>
> [W]here the agreement contains an arbitration clause, the court should apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." . . . [I]n cases involving broad arbitration clauses the [U.S. Supreme] Court has found the presumption of arbitrability "particularly applicable," and only an express provision excluding a particular grievance from arbitration or "the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."

*Simon*, 398 F.3d at  773 n.12.  The arbitration clause in the instant case is broadly

stated:   "[A]ny dispute[ ] relating to this Account will be submitted to binding arbitration

. . . ."  Phelps' claims of fraud and other torts, various statutory securities violations,

declaratory judgment, and violations of Ohio statutory law all facially relate to the

contract between Phelps and US Metals and are, therefore, presumptively arbitrable.

Phelps' argument to the contrary rests upon his own interpretation of the meaning of the

contract.  As issues regarding the proper interpretation of parts of the contract other

than the arbitration clause are for the arbitrator, Phelps cannot avoid arbitration by

asserting a possible contract interpretation under which some of his claims might not be

arbitrable.[7]

---

[7]  In addition, it is by no means clear that even if Phelps's interpretation is correct that any of his claims would be unrelated to the contract.

27

For the reasons given above, Phelps' argument that his claims sounding in tort and statutory law should not be referred for arbitration is without merit.

C.      *Whether US Metals' failure to register in the state of Ohio makes the contract void ab initio*

Phelps asserts that because US Metals failed to register in Ohio as a precious metals dealer, the contract is void.  Consequently, Phelps concludes, the arbitration clause is without effect.

As already discussed, a party may only avoid arbitration by arguing fraud in the inducement of the arbitration clause itself.  Alleged irregularities in the formation of the contract as a whole are an issue for the arbitrator to decide.  *Great Earth*, 288 F.3d at 889-90.  Consequently, Phelps' assertion that the contract is void *ab initio*, even if true, is insufficient to avoid arbitration.

## V.  Summary

The contract contains an enforceable arbitration clause requiring that all disputes related to the contract be submitted to binding arbitration.  All Phelps' claims are facially related to the contract, triggering a presumption that they are all arbitrable.  Phelps' assertions to the contrary fail to overcome that presumption.  For these reasons, defendants' motion to compel arbitration should be granted and the proceedings stayed pending arbitration.


Date:  December 3, 2009                                      */s/ Nancy A. Vecchiarelli*
                                                            United States Magistrate Judge

## **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the**

28

Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  **28 U.S.C. 636(b)(1)**. Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See* **_United States v. Walters_, 638 F.2d 947 (6th Cir. 1981)**.

29